[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
This action for a legal separation was commenced by the plaintiff wife in July 2000. Thereafter, the defendant husband filed a cross-complaint for a legal separation. At the commencement of trial the defendant made an oral motion to amend his prayer for relief to include a dissolution of marriage. This motion was granted. The case was tried over a period of three trial days. Both parties were represented by counsel. The parties testified as did two lay witnesses. The parties are in agreement on child custody and access. Evidence was presented on financial issues including child support, alimony, division of assets and liabilities, counsel fees, health insurance and life insurance. Numerous exhibits were entered into evidence. The court has considered all of the statutory criteria for the orders to be issued. The statutory criteria will not be restated here. CT Page 1111
The parties were married on February 25, 1978. There are three minor children issue of the marriage: Meredith LaCombe born October 3, 1985, Mark LaCombe born July 19, 1987, and Matthew LaCombe born October 18, 1993. No other minor children have been born to the wife since the date of the marriage. The parties have two adult children who both attend college at the University of Scranton. The parties have not been recipients of public assistance during the period of the marriage.
The plaintiff wife is 47 years old and is in apparent good health. She has a high school education. At the time of the marriage she was employed in a hospital. But, she has not been employed from the time of the birth of her first child until 6 weeks before the start of the trial when she began a part-time job as a paraprofessional with the Glastonbury school system. She works 19.8 hours per week and earns $9.50 per hour for a gross weekly wage of $188. She does not have health insurance available to her. She is hopeful that she will be able to expand her hours to 30 hours per week in September 2002 at which time she would be eligible to obtain health insurance. The reason the plaintiff sought a legal separation rather than a dissolution of marriage is so that she would be eligible to remain on the defendant's health insurance until she could obtain coverage through the school system. Her cost to obtain her own coverage at this time is $276 per month.
The defendant husband is 46 years old. He is treated for glaucoma, high blood pressure, and acid reflux syndrome, but these conditions do not limit his ability to be employed. He has a high school education. At the time of the marriage he was self-employed in building and home remodeling. He remained in this line of work until 1996 when he became a sales representative for Planit Software working on a commission basis. This company sells a computer program for designing kitchens and cabinets. The defendant had become proficient in the operation of this program through his remodeling work. His sales territory included New York and New England. This required frequent travel. The defendant was paid on a commission basis. In April 1998 the defendant became an employee of Planit Software as vice president in charge of the entire United States. The defendant's employment called for a yearly salary of $90,000 plus a commission on United States sales. A reasonable estimate of the commissions for 1998 would have been $24,000 if the defendant had been employed for the full year. However, within a short time after he joined Planit, the company was involved in a merger which brought in new management. The defendant became disenchanted with the direction of the company and voluntarily left his employment November 1998. He returned to being an independent sales representative. He acts as a manufacture's representative for two kitchen cabinet makers and continues to sell the Planit program. He originally did business as a New York Subchapter S CT Page 1112 corporation. But, since July 2000 he has operated as a limited liability company known as Mark LaCombe, LLC. This company has assets of $4,530. There was no evidence of the value of the company.
The evidence is clear that the marriage is broken down irretrievably. The causes of the breakdown are more complex than either party wants to admit. The parties had a happy marriage for several years. The defendant was the breadwinner; the plaintiff stayed home and raised the children. After the birth of their youngest child in 1993 the plaintiff wanted the defendant to be more engaged and involved with the family when he was not at work. The defendant never acknowledged or understood the plaintiff's concerns and requests. This led to arguments. These arguments were exacerbated by an issue which also arose in 1993 when the plaintiff's sister moved from the Long Island town where the parties lived to Glastonbury, Connecticut. The plaintiff was very close to her sister and began to talk about wanting to move to Glastonbury as well. Thus began a bizarre saga which lasted six years until the parties finally moved to a house on Papermill Road Glastonbury in the spring of 1999. The parties have completely different versions of this saga. The plaintiff feels that, after her initial enthusiasm for the move cooled, the parties came to an agreement that they would not move while the children were actively involved in their schools and local activities. The defendant feels that the plaintiff continued to lobby for the move. The truth lies somewhere in the middle. The issue of the proposed move became very contentious. In a reversal of their original positions, the defendant began to feel that the problems of the marriage would be solved only if the family moved to Connecticut, while the plaintiff vacillated in her feelings, sometimes supporting the move but then deciding that the parties must work out their other problems first. Although the six years of indecision regarding the proposed move was a major factor in causing the breakdown of the marriage, I am not able to determine whether either party was more at fault.
The plaintiff argues that she was deceived by the defendant into agreeing to move by false representations of the defendant that he would make a serious effort to work on the underlying problems of the marriage. The plaintiff claims that the defendant made no effort to work on their problems after moving to Glastonbury and asked for a divorce within three months after the move. There is no doubt that this is the plaintiff's honest perception of what happened. There is also no doubt that the defendant's honest perception is that he pressured the plaintiff to make the move because of a belief that it was the only chance that they had to solve the problems of the marriage. He was mistaken. The parties had more fundamental problems with their relationship which could not be solved with a move to a new home. But, I do not find that the defendant was deceitful in his handling of the move; only mistaken. CT Page 1113
The major issue in the case is the calculation of child support and the determination of alimony. This depends upon a finding of the defendant's earnings. The parties differ greatly on this point. The defendant's's financial affidavit shows current total gross earnings of $1,264.73 per week ($65,765.96 per year) from his business as a manufacturer's representative. This is based upon the defendant's practice of drawing $5,000 per month plus an additional $200 every two weeks. However, in his financial affidavit of December 5, 2000 the defendant had shown gross earnings of $1,725.99 per week ($89,751.48 per year) based on a draw of $7,000 per month plus an additional $98.08 every week. The defendant's business has not changed since December 2000. His explanation for the changes in income reflected on his financial affidavits was unconvincing. Furthermore, the court does not believe that a man with a wife and five children to support would voluntarily leave a job earning over $100,000 to return to a position earning $65,000 per year. The defendant would not have been that irresponsible. I find that the defendant's income from his business is in fact $1,725.99 per week ($90,000 per year). Therefore, presumptive child support should be calculated based upon this figure.
The plaintiff argues that the defendant has additional earning capacity. The proper way to calculate child support is to use the current earnings of the parties and then decide whether a deviation is in order under Section 46b-215a-3 (b)(1)(B) of the Guidelines. That section permits the court to deviate from presumptive support if it would be inequitable or inappropriate based upon a parent's earning capacity. Alimony may be based upon earning capacity provided that there is sufficient evidence from which that capacity may be determined. Millerv. Miller, 181 Conn. 610, 611-612 (1980).
When the parties lived on Long Island the defendant earned additional money at various times by engaging in building projects on his own or in conjunction with others. In the fall of 1999, after the move to Glastonbury, the defendant represented to the plaintiff that in the event that the parties separated they would be able to meet their obligations because his earnings would be in the range of $100,000-$125,000. The difference between these figures and his business income of $90,000 was to come from building income to be made on the side. Since the move to Connecticut, the defendant has not done any building. It is possible, but not probable, that the defendant will be able to earn additional money on an irregular basis by engaging in building projects in addition to his regular occupation. Because income from these projects would be inconsistent and hard to predict, this potential additional earning capacity will not be used to justify a deviation from presumptive child support or in determining other financial orders. CT Page 1114
With regard to the payment of alimony, the defendant has superior vocational skills, employability, and sources of income. It is not likely that the plaintiff will ever be able to get enough retraining to be able to earn at the level commanded by the defendant. The needs of the plaintiff are greater than those of the defendant. She has been, and continues to be, the one who raises the children.
The plaintiff and the children now live in a house owned by the plaintiff at 48 Duxbury Lane in Glastonbury. The defendant had left the Papermill Road home in June 2000 and presently lives in his office at 11 Industrial Drive in Waterford. He is friendly with the owner of the property and has never had to pay rent. The defendant claimed that he began paying $800 per month rent last month. Regardless of whether this is accurate, the defendant does need to find more appropriate living quarters where he can have the children overnight. He will be required to pay rent at that time.
The history of the family finances since the separation of the parties is confusing. In June 2000 the defendant left the family home on Papermill Road and the plaintiff began this action. Rather than pay pendente lite support, the defendant continued to maintain control of all joint funds and to pay the expenses of the property including mortgage, insurance and taxes as well as most other family expenses. He did this by depositing his draws from his business into a joint family PMA account and then writing checks to pay family bills as well as his own living expenses. He continued to pay family expenses until July 12, 2001. During this time he paid family bills of approximately $245,000. Unfortunately, the defendant was not depositing enough to cover all of the expenses. Therefore, family assets were depleted. The plaintiff charges that the defendant was not depositing all of his income and was not providing proper accountings of his expenditures; the defendant charges that the plaintiff was living beyond her means and was incurring excessive credit card debt. There is some truth to both charges. But most of the confusion regarding family finances occurred because the parties failed to communicate with each other during the pendency of this case. As a result of this confusion, the family assets have been depleted by more than $200,000. Since August 1, 2001 the defendant has not paid the family bills. The plaintiff has supported herself and the minor children on money in the joint PMA account and on an inheritance of $28,000 which the plaintiff received during the pendency of this case. During this time, the PMA account went from $16,500 to $5,300 and the inheritance went from $28,000 to $21,000 in a Fleet checking account.
When the parties sold their house in New York they realized net cash of more than $200,000 which they put into the PMA account at People's Bank. CT Page 1115 This cash was in addition to the funds they invested in the Papermill Road property. The parties sold the Papermill property after the separation and a new home was purchased in the plaintiff's name at 48 Duxbury Lane in Glastonbury. The parties lost about $50,000 in this exchange of property. The Duxbury Lane property is worth $309,000 and is subject to a mortgage in the amount of $204,000. Therefore, the equity in this home is $105,000. The parties have $102,500 in an escrow account at Fleet Bank representing the net proceeds of the sale of the Papermill Road property.
Almost all of the family household furnishings remain with the plaintiff in the Duxbury Lane home. The parties are at odds over the value of these furnishings. The evidence on the issue related to replacement cost, not fair market value as used furnishings. The division of assets will be skewed in an unreasonable way if the furnishings are valued at the level suggested by the defendant, i.e., $75,000. Rather, the court will find that there was insufficient evidence to establish a value of these furnishings.
The plaintiff owns a 2000 Honda automobile with a value of $16,395 and a loan with a balance of $13,395.
There are two large joint credit card balances: $11,477 to Chase Mastercard, and $12,057 to DMB Mastercard. These balances were incurred for family purposes.
The defendant paid his attorneys a total of $25,000, all of which he paid from joint funds in the PMA account at People's Bank. The defendant owes his attorney an additional $7,500. The plaintiff has not paid her attorneys anything. She owes her attorneys approximately $40,000.
With regard to the division of assets and liabilities, the court concludes that a roughly equal division is appropriate. Therefore, the credit card debt which was incurred for family purposes should be paid from joint funds. Prior to the asset division the plaintiff should be able to pay her attorneys $25,000 from joint funds, just as the defendant did. Also, the plaintiff should be able to exclude from the property division her inheritance of $28,000, and should be entitled to a credit of $11,200 which was spent on family expenses out of the PMA account after August 1, 2001. Because of the plaintiff's need and that of the children, there should be an unequal division of the household furnishings. Finally, the plaintiff needs to retain the house as a place to raise the children and needs a reasonable amount of cash for family emergencies. Therefore, a part of the defendant's share of the assets must come in the form of a long-term promissory note and mortgage in an amount which reflects the various considerations discussed above. CT Page 1116
The court issues the following orders:
1. The marriage of the parties is dissolved pursuant to the defendant's cross-complaint as amended.
2. The parties shall have joint legal custody of the minor children. The minor children shall have their primary residence with the plaintiff mother. The defendant shall have reasonable access to the minor children, which may include overnight visitation if he obtains his own home or apartment with suitable accommodations for the children.
3. The defendant shall pay child support to the plaintiff in the amount of $346 per week. Child support shall be payable until each minor child attains the age of 18 years, but if still in high school, support shall continue through high school graduation but not beyond the age of 19 years. The parties are ordered to give notice to each other of any changes of their place of employment, hours worked, or rate of pay. In addition, the parties are ordered to provide copies of their income tax returns to the other party each year upon filing.
4. The defendant shall pay alimony to the plaintiff in the amount of $400 per week plus one-half of the plaintiff's cost of health insurance until she is able to obtain coverage through her employment. Alimony shall be payable until the death of either party or the remarriage of the plaintiff.
5. The defendant shall maintain health insurance for the benefit of the minor children. The defendant shall pay 56% of unreimbursed medical and dental expenses for the minor children and the plaintiff shall pay 44%.
6. The plaintiff shall retain the property at 48 Duxbury Lane, Glastonbury, Connecticut. Within 30 days from the date of this judgment the plaintiff is ordered to execute a promissory note and mortgage on this property to the defendant in the amount of $38,500 payable on February 1, 2013 together with interest at the rate of 3% per annum. The note and mortgage shall contain the customary provisions for the payment of attorneys fees and costs in the event of default. The defendant shall be obligated to subordinate his mortgage in the event that the plaintiff is able to refinance the property, provided that the refinancing does not increase the outstanding principal balance of the mortgage recorded ahead of the defendant's mortgage.
7. The defendant shall retain his ownership of Mark LaCombe, LLC free and clear of any claims of the plaintiff. CT Page 1117
8. The proceeds from the sale of the Papermill Road property on deposit in an escrow account at Fleet Bank shall be disbursed as follows:
$25,000 to the plaintiff as counsel fees;
$11,477 to Chase Mastercard to pay the balance incurred for family purposes;
$12,057 to DMB Mastercard to pay the balance incurred for family purposes;
$20,000 to the defendant;
The balance of approximately $33,466 to the plaintiff.
9. The plaintiff shall retain the 2000 Honda automobile free and clear of any claims of the defendant. The plaintiff shall pay the loan on the vehicle and shall indemnify and hold the defendant harmless from responsibility for this loan.
10. The defendant shall make any payments required on all four student loans shown on the defendant's financial affidavit including the PNC Bank loan which the plaintiff has been paying. The defendant shall indemnify and hold the plaintiff harmless from liability for the loans.
11. The defendant shall pay the People's Bank Mastercard shown on his financial affidavit and shall indemnify and hold the plaintiff harmless from liability for this debt.
12. The plaintiff shall retain the balance in her Fleet checking account free and clear of any claims of the defendant. The defendant shall retain the balance in his People's Bank checking free and clear of any claims of the plaintiff.
13. The plaintiff shall retain the balance in the joint People's Bank PMA account free and clear of any claims of the defendant.
14. The defendant shall retain the stocks with Brown Co. free and clear of any claims of the plaintiff.
15. The defendant shall transfer from his IRA to the IRA of the plaintiff sufficient funds to equalize the IRA's of the parties.
16. The household furnishings owned by the parties are to be divided by the parties so that the plaintiff receives 75% of the value of these furnishings and the defendant receives 25% of the value. If the parties CT Page 1118 are unable to make this division within 30 days, the parties are referred to Family Relations for investigation, conciliation, and report.
17. The defendant shall maintain a life insurance policy with a death benefit of at least $400,000 naming the plaintiff as beneficiary until his alimony and child support obligations have been paid in full. This insurance is available and affordable because there is already a $500,000 policy in existence at $33.65 per week. The court deems $400,000 sufficient to secure the defendant's obligations.
18. In any year in which the plaintiff has not worked an average of at least 30 hours per week for at least six months, the defendant shall be entitled to take the dependency exemptions for all of the minor children provided that he is able to do so under Federal law and provided that he is current in his child support payments on December 31 of the year for which the exemptions are claimed. In any year in which the plaintiff has worked an average of at least 30 hours per week for at least 6 months, (1) the plaintiff shall be entitled to take the dependency exemption for the minor child Meredith provided that she is entitled to do so as a matter of Federal law, and (2) the defendant shall be entitled to take the dependency exemptions for the minor children Mark and Matthew provided that he is entitled to do so as a matter of Federal law and provided that he is current in his child support payment on December 31 of the year for which the exemptions are claimed. Once the plaintiff is no longer entitled to take Meredith as an exemption, the plaintiff shall be entitled to take the exemption for Mark. Once the plaintiff is no longer able to take the exemption for Mark, the parties shall alternate the exemption for Matthew with the defendant taking the first year.
____________________ Pickard, J.